UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOY A. PETTIROSSI-POLAND<br>PLAINTIFF | :<br>:<br>: | |
| V. | : | CV |
| INTEGRATED FINANCIAL PARTNERS, INC.<br>DEFENDANT | :<br>:<br>: | NOVEMBER 11, 2009 |

## COMPLAINT

### Parties:

1. Plaintiff Joy Pettirossi-Poland is a citizen of the State of Rhode Island. At all relevant times of this complaint she was employed by defendant Integrated Financial Partners, Inc, at its office located at 115 Glastonbury Boulevard, Glastonbury, Connecticut.

2. Defendant Integrated Financial Partners, Inc. ("IFP") is a corporation registered to transact business in the State of Connecticut and organized under the laws of the State of Massachusetts with its principal place of business located in Waltham, Massachusetts.

### Jurisdiction:

3. Plaintiff is a citizen of the State of Rhode Island and Defendant is a citizen of the State of Massachusetts. The amount in controversy is more than $75,000. This Court has jurisdiction based on diversity under 28 U.S.C. § 1332.

### Facts:

4. In 2004, Plaintiff joined Integrated Financial Partners as a Registered Representative working from IFP's office located at 115 Glastonbury Boulevard,

Glastonbury, Connecticut. Plaintiff was licensed to sell financial products used in retirement planning, such as annuities and life insurance, under an agreement with Lincoln Financial Group, a marketing name for Lincoln National Corporation and its affiliates, Lincoln Financial Advisors Corporation, an Indiana Corporation, Lincoln Life & Annuity Company of New York and Lincoln National Insurance Associates, Inc, a Connecticut corporation ("Lincoln").

5. In early 2004, Paul Saganey ("Saganey"), President of IFP, offered to employ Plaintiff in a new role, Marketing Associate, in connection with a program that Saganey called the Professional Partners Program ("PPP" or "the Program").

6. The business model for the Program envisioned approaching a certified public accountant ("CPA") with the proposal that IFP would place a Registered Representative/Financial Planner, associated with IFP and licensed with Lincoln, inside the CPA firm to provide financial planning services. Under the Program, based solely on the referral of the CPA's client to the IFP Financial Planner, the CPA would earn a split on the commission paid by Lincoln to the Financial Planner and IFP so long as the CPA was also licensed to sell financial products. The Program also envisioned providing in-office IFP Registered Representative/Financial Planner with a CPA who was not licensed, but under this circumstance the CPA could not receive a split of the commission based on the referral but would still be able to offer financial planning services in-house. In certain circumstances rental agreements would be set up so that the IFP Registered Representative/Financial Planner would rent the space from the CPA. In both scenarios, financial products purchased from Lincoln would be processed

through IFP's office in Glastonbury and IFP would receive part of the commission through the agency and grid system.

7. Saganey offered Plaintiff this new employment opportunity at IFP consisting primarily of marketing and business development services, based on his knowledge of Plaintiff's past performance working as a partner with other Registered Representatives/Financial Planners at IFP and in prior firms where Plaintiff was successful in generating leads and referrals, and also because Saganey hoped to mine leads generated through contacts of Plaintiff's father, a retired CPA previously employed by the CPA firm of Ernst & Young.

8. Plaintiff agreed to discuss this employment opportunity with Saganey in the presence of her father and so a meeting was held in Florida in early 2004 attended by Plaintiff, John Pastore, an IFP Vice President, Saganey and Plaintiff's father.

9. During the meeting in Florida, Plaintiff expressed concern that under this arrangement she would be vulnerable to theft of her right to a commission since she was not the Registered Representative who would be submitting the application form that listed those who were entitled to a percentage of the initial commission payment and the residual payment, referred to as the trail.  Saganey offered to protect Plaintiff's right to be paid a split of the commissions generated by her efforts and agreed that any agreement between IFP and Registered Representatives/Financial Planners entered into as part of the Program would provide for the right to a forensic audit to assure Plaintiff was receiving the compensation she was entitled to be paid.

10. Under the terms of this employment offer, Plaintiff would provide marketing and business development services on behalf of IFP in the form of "opening doors" with CPA firms in Connecticut, Rhode Island, Massachusetts, New York, and New Hampshire operating from the office in Glastonbury, Connecticut. Plaintiff would also be responsible for setting up meetings IFP Vice Presidents John Pastore and Ray Lucas to make presentations of the PPP.

11. On the return flight from Florida, Saganey agreed to pay Plaintiff the sum of $4500 as a draw for her marketing contacts and business development efforts and as an advance for the commissions Plaintiff would be paid once the Program became fully operational. IFP continued to pay Plaintiff $4500 per month from May of 2004 through June of 2006.

12. In May of 2004, Saganey assigned Plaintiff the title of Director of Business Development and IFP provided business cards and letterhead with this title. IFP Vice President John Pastore and Saganey introduced Plaintiff at business development seminars and meetings as IFP's Director of Business Development. In the early part of 2005, Saganey also asked Plaintiff to perform recruiting services for IFP whereby Plaintiff recruited financial planners to the PPP. Plaintiff arranged numerous meetings for Saganey, Pastore and Lucas as part of this endeavor.

13. As part of the marketing strategy associated with the Program, Plaintiff arranged to team up with the payroll service company known as Paychex to leverage its relationship in its "Core" division. At all times relevant to this complaint, Paychex provided leads and business development opportunities to Plaintiff and IFP that

resulted in signing CPA's into the program. Plaintiff also developed other marketing strategies with Paychex known as MMS, 401K and Direct Business Owner.

14. In order to document Plaintiff's right to be paid commissions from the sale of financial products generated as a result of her marketing efforts, Saganey provided Plaintiff with a draft of a proposed agreement that both Plaintiff and Saganey developed and subsequently amended entitled, "Confidentiality and Non-Solicitation Agreement *Paychex Pilot Program*" ("the Agreement").

15. Under the terms of the Agreement, Lincoln Financial Advisors Corporation & Integrated Financial Partners would enter into a contractual arrangement with an individual Lincoln Registered Representative/Financial Planner, who would be placed in the CPA firm generated by Plaintiff's marketing efforts.

16. At all times relevant to this complaint, Saganey decided which Registered Representative/Financial Planner would be assigned to the CPA office that Plaintiff's marketing efforts generated.

17. The Agreement restricted competition following the termination of the Agreement, required confidentiality and gave IFP the right to add or remove Registered Representatives/Financial Planners within the CPA firm.

18. The Agreement provided that the use of any DBA other than Lincoln Financial Advisors or Integrated Financial Partners, Inc. on business cards or letterhead, without prior written approval, could be grounds for termination of the Registered Representative.

19. The Agreement provided that in regard to the financial planning services, investment advisory or asset management services ("the Services") and in regard to the sale of life insurance, annuities and other financial products ("the Products"), "all parties named in this agreement will split any business written according to the following compensation structure:"

20. Although not named as a party to the Agreement, Plaintiff was specifically referred to by name as a person being entitled to a percentage split of any business written along with the Representative and the CPA.

21. Although the Agreement did not describe the services to be rendered by Plaintiff, except as such would be understood by reference to the Pilot Paychex Program, Plaintiff's right to participate in the split of any business written by the Registered Representative/Financial Planner was indicated by listing her function, "Marketing Associate, " immediately adjacent to her name and the percentage split that was due Plaintiff.

22. During the term of her employment by IFP, Plaintiff was not permitted to offer her "door opening," marketing services to broker-dealers similar to IFP.

23. The Agreement restricted Plaintiff's future right to commission payments by the following language: "If IFP, its successors, or assignees and Joy A. Pettirossi agree to terminate their relationship she will continue to get the amounts called for as outlined herein as long as she does not terminate to go to another Broker-Dealer and continues to assist in sales activities."

24. The Agreement stated that "All Representatives further agree that ALL leads will flow through and be disclosed to Joy Pettirossi for IFP" and to a representative of Paychex.

25. The Agreement also stated that in the event of a dispute regarding commissions "both disputing parties will, as a matter of standard procedure, agree to grant access to view all client files joint or individual for any forensic accounting purposes."

26. An amended version of the Agreement that came into use in 2008 for reasons set forth herein at paragraph 35, provided, "New Business and client status updates will be made available by planner to Joy Pettirossi monthly. Planner will ensure that Joy Pettirossi's signature is submitted on all new business and Joy Pettirossi will ensure all business will be submitted in a timely fashion after signing on applications. New business and commission log will be signed and verified quarterly for accurate reporting and receiving of commissions."

27. The Agreement also provided that "any planner participating in the Paychex pilot" had an option "to buyout Joy A. Pettirossi's interest" by mutual agreement to a lump sum payment.

28. The Agreement further stated with regard to the purchase of Plaintiff's interest, "This buyout must have the approval of Paul Saganey prior to going into effect."

29. From 2005 through 2009, IFP provided Plaintiff with letterhead, email signature and address, business cards, and created power point presentations, whereby IFP informed potential CPA referral sources, clients, and Registered Representatives/Financial Planners that Plaintiff was employed as IFP's Director

of Business Development. Plaintiff also received her business mail, phone messages and email at the Glastonbury, Connecticut office of IFP.

30. Officers of IFP, including Saganey and IFP Vice President of the Program, John Pastore, identified Plaintiff as the Director of Business Development in meetings with CPA firms such as Starr Finer Starr, Hanscom Associates, and Cohen and Cohen.

31. From 2004 through 2009, IFP provided the Agreement for Plaintiff's use in signing Registered Representatives to participate in the Program. In each and every case, Plaintiff signed the Agreement on behalf of IFP and Lincoln. When Plaintiff also listed her title, she indicated that she was signing in the capacity of Director of Business Development.

32. From 2004 through 2009, IFP/Lincoln entered into the Agreement with Registered Representatives/Financial Planners as a result of Plaintiff's marketing efforts in Connecticut, Rhode Island, Massachusetts, New York, and New Hampshire.

33. Between 2004 and 2007, IFP directed and controlled Plaintiff's marketing efforts, and required Plaintiff to attend management meetings at the IFP headquarters in Waltham Massachusetts, at the Glastonbury, Connecticut office, and at other locations. Plaintiff was also required to participate in 8:00 AM Monday morning conference calls. During the IFP management meetings, strategies for marketing the Program were formed and assignments were given out to Plaintiff and others in attendance by Saganey.

34. Between 2004 and 2009, Saganey controlled access at the IFP office in Glastonbury, Connecticut, to information that Plaintiff required to audit compliance by the Registered Representatives who signed the Agreement.

35. Commencing in 2006 and continuing to the present, Plaintiff began to receive information that Registered Representatives/Financial Planners were not listing Plaintiff on the application for the financial product with the result that Plaintiff was being deprived the split of the commission payment that was required by the Agreement. This discovery motivated the amendment to the Agreement that was put into use in 2008, as indicated herein in paragraph 26

36. Significantly, over the 7 month period from November 2008 through June 2009, Plaintiff's time-consuming investigatory efforts uncovered approximately $80,000 in commissions that were owed to her but not paid because she had not been listed on the application prepared by the Registered Representative/Financial Planner.

37. Between 2006 and 2009, Saganey had specific knowledge but did nothing to prevent the theft of Plaintiff's commission, including simply informing Plaintiff of the fact that she was being denied her rightful split.

38. Between 2006 and 2009, Saganey also had knowledge of referrals and he participated in meetings with Paychex leads along with other Registered Representatives/Financial Planners and did not disclose this information to Plaintiff because of Saganey's bias in favor of the Registered Representative/Financial Planner.

39. On numerous occasions from 2006 through the present Plaintiff requested assistance from Saganey, by way of audit and otherwise, to assure that Plaintiff was receiving the commission payments that Plaintiff was entitled to receive as compensation under the terms of her employment as the Director of Business Development.

40. While Saganey made some effort to assist Plaintiff, as in the case of amending the Agreement to require monthly reports and notification to Plaintiff, Saganey refused to take aggressive action to enforce the Agreement for the benefit of Plaintiff, to monitor compliance or audit the records of the Registered Representatives/Financial Planners because of his bias and favoritism toward the Registered Representatives/Financial Planners.

41. As a result of Saganey's unreasonable refusal to enforce the Agreement, or to monitor and audit compliance with the Agreement, Plaintiff lost commission payments that Plaintiff was entitled to receive.

42. In addition, when Plaintiff insisted that Saganey make efforts to enforce the Agreement and audit or monitor compliance, Saganey threatened retaliation against Plaintiff.

43. Specifically, in November of 2007, during a meeting with Jay Oldroyd, Saganey threatened to "make business go away," meaning he was going tell a purchaser of a financial product that he could no longer do business with IFP, when Plaintiff requested his assistance in obtaining cooperation from a Registered Representative who refused to cooperate in providing information regarding a commission covered by the Agreement

44. In March of 2009, when Plaintiff became involved in a dispute with Chris Cavallaro, a Registered Representative who had signed the Agreement, over the failure to list Plaintiff on applications for financial products that would have generated a split that Plaintiff was entitled to under the Agreement, Saganey informed Plaintiff that if she did not stop pursuing the enforcement of her right to be paid commissions that he would terminate all of her CPA relationships and he would not allow Plaintiff to use IFP resources, including Ray Lucas, in marketing efforts directed toward another major payroll processing firm, ADP.

45. As a result of Saganey's failure to take action to enforce the Agreement, to monitor compliance and to audit the records of Registered Representatives as requested by Plaintiff, Plaintiff has been denied the payment of substantial commissions due to her under the Agreement.

**Count One:**

46. Defendant IFP has unreasonably failed to pay Plaintiff wages Plaintiff has earned by virtue of her efforts in connection with the PPP as documented in the Agreement in violation of Connecticut General Statutes § 31-72.

47. As a result of the Defendant's unreasonable failure to pay Plaintiff wages, Defendant IFP is liable to Plaintiff for wages in twice the amount owed and attorneys' fees.

**Count Two:**

1. Paragraphs 1 through 45 of Count One are incorporated herein by reference and made paragraphs 1 through 45 as though more fully set forth herein.

39. By virtue of being specifically named in the Agreement between IFP/Lincoln and the individual Registered Representative/Financial Planner as a person who is entitled to a split of the commission, and based on IFP's assumption of the specific promise in the Agreement that "all parties named in this agreement will split any business written according to the following compensation structure," Plaintiff is a third party beneficiary to all of the Agreements between IFP/Lincoln and the Registered Representatives/Financial Planners entered into between 2004 and 2009 as part of the Program.

40. Defendant IFP has breached the Agreements, including the implied covenant of good faith and fair dealing, by failing to monitor, audit and pay the commissions owed to Plaintiff under the Agreements.

41. As a result of Defendant IFP's breach of the Agreements, Plaintiff has suffered damages in the form of lost past and future commission payments.

Wherefore, Plaintiff claims a TRIAL BY JURY and judgment against the Defendant IFP along with the following relief:

1. Damages sufficient to compensate Plaintiff for her losses;

2. An audit of the financial records of all parties to the Agreement;

3. Liquidated damages pursuant to Connecticut General Statutes § 31-72;

4. Attorneys' fees pursuant to Connecticut General Statutes § 31-72;

5. Interest for money wrongfully withheld pursuant to Connecticut General Statutes § 37-3a; and

6. Costs.

        PLAINTIFF
        JOY PETTIROSSI-POLAND

        By: _____
        Jacques J. Parenteau
        Fed. Bar No.: (CT09771)
        Madsen, Prestley & Parenteau, LLC
        105 Huntington Street
        P.O. Box 1631
        New London, CT 06320
        (860) 442-2466 – Telephone
        (860) 447-9206 – Facsimile
        Attorneys for the Plaintiff
        jparenteau@mppjustice.com